**CONTINUATION OF APPLICATION FOR A SEARCH WARRANT**

I, Ryan Roskey, a Special Agent (SA) of the Federal Bureau of Investigation (FBI), being duly sworn, state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this continuation in support of application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, specifically an Apple iPhone electronic device, which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have served as such since 2019, and during that time I have investigated numerous violations of federal law. I am presently assigned to the Lansing Resident Agency of FBI Detroit Division. Prior to becoming an FBI Special Agent, I was employed as a police officer and detective for approximately 10 years. As a police detective, I was responsible for numerous types of complex criminal investigations involving child abuse, sexual assault, internet crimes against children, child sexual abuse material, drug endangered children, human trafficking, narcotics trafficking, firearms violations, gang investigations, fugitives, and violent crime. In this role, I have been assigned to the United States Marshals Violent Fugitive Task Force and the FBI Omaha Safe Streets Task Force.  I have completed hundreds of hours of specialized investigative training from the FBI, Drug Enforcement Agency (DEA) and United States Department of Justice. My current duties with the FBI include the investigation of various violations of federal criminal law, including but not limited to matters involving 18 U.S.C. § 924(c), firearm possession in furtherance of violent crime, and in violation of 18 U.S.C. Code § 1951, interference with commerce by threats or

violence (Hobbs Act Armed Robbery), and 18 U.S.C. § 2, aiding and abetting, and 18 U.S.C. § 371 conspiracy to commit the same offenses (SUBJECT OFFENSES).

3. During the performance of my duties as a Special Agent with the FBI, I have participated with other law enforcement officers and agents in the investigation of allegations that PASCHAL UCHENDU, date of birth (DOB) XX/XX/1995, has engaged in violations of the SUBJECT OFFENSES. The information contained in this continuation is based upon information provided to me by other law enforcement officers and agents who have participated in this investigation. This continuation does not contain all the information known as a result of this investigation, but only those facts that I believe are necessary to establish probable cause for the search warrant sought.

## SUSPECT INFORMATION

4. PASCHAL UCHENDU is a 25-year-old man who resides in Mason, Michigan. Uchendu worked for Empyreal Logistics since November 2021. In this role, UCHENDU drove a cash-in-transit van also known as a money currier vehicle. UCHENDU's employment at Empyreal Logistics was terminated after February 15, 2022.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5. The property to be searched is an Apple iPhone, blue in color, hereinafter "DEVICE." The DEVICE does not have exterior markings that indicate the IMEI or serial number of the DEVICE. The DEVICE is currently located at the FBI Lansing Resident Agency, which is in the Western District of Michigan. This warrant would authorize the forensic examination of the DEVICE, described above and in Attachment A, for the purpose of identifying, examining, copying, and seizing the records and information described in Attachment B.

**SUMMARY OF INVESTIGATION**

6. On February 15, 2022, UCHENDU reported to law enforcement that while driving an Empyreal Logistics cash-in-transit van he had been intercepted and robbed by two individuals. UCHENDU reported that one of the robbers possessed a rifle during the robbery.

7. Law enforcement interviewed UCHENDU immediately following his report of the armed robbery. Law enforcement reviewed video surveillance footage and audio recordings from the cash-in-transit van's security system as well as other security systems along UCHENDU's February 15, 2022, path of travel. Law enforcement also interviewed Empyreal Logistics personnel regarding its policies and procedures as well as UCHENDU's training.

8. I am informed that (1) law enforcement found that UCHENDU violated Empyreal Logistics policies and procedures regarding stopping the cash-in-transit van during his route; (2) UCHENDU made a personal stop at Best Buy during his route and two suspect vehicles involved in the robbery arrived at the same Best Buy parking lot at or near the exact time UCHENDU arrived; (3) law enforcement determined multiple inconsistencies between UCHENDU's statements to law enforcement regarding the details of the robbery and the video and audio footage obtained by law enforcement; (4) UCHENDU admitted he communicated with others using the DEVICE around the time of the robbery but could not recall the names of each of those individuals; and (5) UCHENDU agreed to participate in a polygraph examination conducted by the FBI on February 18, 2022, in which he was asked about his role, if any, in the February 15, 2022, robbery and the results of the polygraph examination were deemed conclusive and deception was indicated. As detailed below in this continuation, there is probable cause to believe that evidence, fruits, and instrumentalities of SUBJECT OFFENSES may be found in the DEVICE described in Attachment A.

**PROBABLE CAUSE**

*Report of Armed Robbery*

9.      On February 15, 2022, at approximately 1:55 PM, Meridian Township Police (MTPD), responded to Okemos Community Church, located at 4734 Okemos Road, Okemos, Michigan, in reference to a reported armed robbery. The caller, PASCHAL UCHENDU, advised the dispatcher that he was the driver of a cash-in-transit van and had just been robbed by two black males with rifles. UCHENDU advised the male suspects left in a blue Sport Utility Vehicle (SUV) and the SUV proceeded southbound on Okemos Road.

10.     Documents provided by Empyreal Logistics (EL), the owner of the cash-in-transit van, show that over $1,000,000 was taken during the robbery, including $90,000 from Capital National Bank, a Federal Deposit Insurance Corporation insured institution.

*Interview of Uchendu (EL Van Driver)*

11.     MTPD Detectives and Special Agents with the FBI interviewed UCHENDU at 4734 Okemos Road.  UCHENDU provided the following information:

    a.      On February 15, 2022, UCHENDU was working for Empyreal Logistics (EL), driving a white Ford Transit cash-in-transit van ("EL Van").  UCHENDU's duties were similar to an armored car driver. That morning UCHENDU picked up his EL Van and manifest from the EL office located at 1235 Roth Drive, Lansing, Michigan. UCHENDU received a manifest each work morning listing various businesses, to include banks, financial, institutions and marijuana dispensaries, where he was required to stop and collect currency. The manifest listed the amount of currency UCHENDU was to collect at each location.

b.  UCHENDU finished his scheduled route and stopped at Best Buy, located at 2020 W Grand River Rd, Okemos, MI 48864. UCHENDU parked the van and walked into Best Buy. Inside Best Buy, UCHENDU purchased a memory card for his personal camera. After the purchase, UCHENDU got back in the EL Van and started driving to Lansing, Michigan where the EL office is located. While driving, UCHENDU diverted from his usual route, due to bridge construction on Okemos Road at the Red Cedar River. While UCHENDU was driving around the area of Okemos Road and Red Cedar River, a black male driving an older blue Buick Rendezvous repeatedly honked his horn and flashed his lights at the EL Van. UCHENDU thought he might have gotten into an accident with the Rendezvous, so UCHENDU pulled over to the side of the road.

c.  A black male (Unsub 1) exited the Rendezvous and approached the driver's side of the EL Van. Unsub 1 told UCHENDU that UCHENDU had hit the Rendezvous. UCHENDU exited the EL Van and walked back to inspect the Rendezvous for damage. While UCHENDU inspected the Rendezvous for damage, a black male passenger (Unsub 2), left the Rendezvous and entered the passenger side of the EL Van. When UCHENDU returned to the van, Unsub 2 displayed an AR-15 type rifle and told UCHENDU to drive away. Unsub 2 directed UCHENDU to Okemos Community Church and directed UCHENDU to park in the parking lot. Unsub 1 followed the EL Van in the Rendezvous and parked behind the EL Van. Once parked, Unsub 2 directed UCHENDU to open the currency safe located in the rear of the EL Van. UCHENDU opened the safe and Unsub 1 and Unsub 2 proceeded to load the Rendezvous with the currency stored in the EL Van. Unsub

1 and Unsub 2 were both wearing masks and hooded sweatshirts with the hoods pulled up over their heads. UCHENDU previously owned a Ruger model AR-15 and Unsub 2 had an AR-15 similar to the one Uchendu owned.

d.  Several weeks ago, UCHENDU got into an automobile accident while at work. UCHENDU struck a traffic cone on the highway and the traffic cone deflected from UCHENDU's vehicle and struck the other vehicle. UCHENDU pulled over to exchange information with the other driver. UCHENDU gave the other driver UCHENDU's information, but UCHENDU never received information from the other driver. UCHENDU was counselled by his management for stopping the van after the accident. UCHENDU was told by his management to only stop in safe areas where other people were around.

e.  UCHENDU did not know of any friends or contacts that would have targeted him for the robbery. UCHENDU told two of his friends and some of his family where he worked. UCHENDU believed he was targeted or surveilled at one of his pick-up locations prior to the robbery.

12.  FBI Agents and MTPD detectives conducted a brief physical review of UCHENDU's phone. No items of interest were noted during the review; however, a physical review of a cellular device does not reveal the same information as a forensic cellular extraction.

### *Empyreal Logistics and its Vans*

13.  EL is headquartered in Denver, Colorado and conducts business in several other states therefore engaging in interstate commerce. An EL Van functions similar to an armored car conducting money pick-ups from businesses and banks. EL drivers are not armed during the performance of their duties. The EL Van Uchendu was driving is a white Ford Transit van. It does

not feature any markings or logos which would indicate the van's purpose or company affiliation. The EL Van was equipped with GPS monitoring, 360-degree exterior video surveillance, interior video surveillance and audio recording capability.

*Surveillance Footage from the Day of the Robbery*

14. MTPD investigators have extensively reviewed the video recordings from the EL van, the Best Buy parking lot, and other surveillance videos from UCHENDU's reported path of travel on the day of the robbery.

    a. The EL Van's security system video footage does not capture the suspect SUV following or trailing the EL Van before UCHENDU's personal stop at Best Buy.

    b. The video surveillance footage from Capitol National Bank, UCHENDU's last scheduled stop, does not feature the suspect SUV in the area during UCHENDU's schedule pickup.

    c. Best Buy video surveillance footage depicting the Best Buy parking lot reveals the following:

        i. UCHENDU parked the EL Van in the Best Buy parking lot. A blue Buick Rendezvous pulled into the Best Buy parking lot shortly after UCHENDU parked the EL van in the lot. UCHENDU is walking into the Best Buy at approximately the same time the Rendezvous is parking. It is unclear where exactly the white SUV parks at in the lot.

        ii. A white SUV pulled into the parking lot near the time the same time as the Rendezvous.

    iii. UCHENDU spent approximately 12 minutes inside Best Buy before returning to the EL Van.  UCHENDU got inside the EL Van and drove out of the parking lot.  The Rendezvous and the white SUV exited the lot and followed the EL Van.

d. The EL Van's security system video footage depicts the Rendezvous following the EL Van after the EL Van left the Best Buy parking lot for several minutes at a low speed around the area of Okemos Road and the Red Cedar River.

e. The EL Van's security system audio recording captured the Rendezvous briefly sounding the horn one time prior to UCHENDU pulling over and being approached by Unsub 1. The EL Van's security video footage depicts the EL Van appear to slow down prior to the Rendezvous honking.

f. The EL Van's security system audio recording captured an exchange between Unsub 1 and UCHENDU after UCHENDU pulled the EL Van over: Unsub 1 told UCHENDU that UCHENDU hit the Rendezvous.  UCHENDU responded that he did not hit the Rendezvous and he will get out of the van and look.

g. The EL Van's security video footage depicted Unsub 1 at the driver's side of the EL Van.  This is a screen shot from that footage:



h.      The EL Van's security system video footage does not depict the EL Van in a position where it could have struck or been in any other type of collision with the Rendezvous at a point in time after the EL Van left the Best Buy parking lot but before the Rendezvous honked.

i.      The EL Van's security system video footage depicts Unsub 2 enter the front passenger side almost simultaneously as UCHENDU exited the El Van.  The EL Van's security system audio recording captured the passenger door shut.  This is a screen shot from the video footage depicting UCHENDU exiting the El Van and the Unsub 2 entering the El Van:



j.  The EL Van's security system video footage depicts UCHENDU return to the driver's side of the EL Van with Unsub 2 sitting in the passenger side seat. Unsub 2 has the AR-15 style rifle positioned in Unsub 2's lap. There is no magazine in the magazine well of the rifle. The EL Van security system audio recording captured Unsub 2 instruct UCHENDU to get into the van and drive. This is a screen shot from the video footage depicting Unsub 2 in the passenger seat with the AR-15 style rifle without magazine:



k.      The EL Van security system audio recording captured Unsub 2 direct UCHENDU to the Okemos Church parking lot.  Unsub 2 then directed UCHENDU to park in the middle of the open lot and open the safe in the back of the van.  The El Van security system video footage depicts the Rendezvous pull in behind the EL Van.

l.      The EL Van's security system video footage depicts a similar white SUV from the Best Buy parking lot parked in the rear of the Okemos Community Church parking lot at the time UCHENDU pulled into the lot.

m.      The EL Van security system video footage depicts Unsub 2 get out of the EL Van and watch UCHENDU at the back of the van.  Unsub 2 went to the back of the van.  Unsub 2 left the AR-15 style rifle in the van during this time.  Unsub 1 and Unsub 2 then loaded the money deposits into the Rendezvous from the EL Van.

While Unsub 1 and Unsub 2 loaded the money deposits, the white SUV left the church parking lot.  After loading the money deposits into the Rendezvous, Unsub 2 went to the front passenger seat and retrieved the AR-15 style rifle.  Unsub 1 and Unsub 2 got inside the Rendezvous and left the church parking lot.

*EL's Policies and Procedures*

15. Law enforcement agents have spoken to multiple members of EL's management about EL's policies and procedures. Based on those interviews, I am informed that UCHENDU violated multiple policies and procedures established by EL to protect cash-in-transit.

   a. First, EL drivers are specifically warned about bump and rob tactics in which a subject attempts to stage an accident in order to distract a driver and intercept cash-in-transit vans. EL drivers are instructed to never pull over a cash-in-transit van in the manner UCHENDU did on February 15, 2022.

   b. Second, according to EL management, the drivers should not have individual access to the vault located in the rear of the van where the money deposits are held. The cash-in-transit vans contain two vaults or safes in the rear of the van.  One of the vaults is specifically used only for money deposits.  Money deposits are deposited via a one-way chute into this vault. The money deposit vault may be accessed with a vault code. According to EL management, drivers should not have the code to the money deposit vault. UCHENDU explained in his interview with law enforcement that he had the code to access the money deposit vault and used the code to access the vault during the robbery.

   c. Third, cash-in-transit van drivers are trained to use a duress button in situations such as an armed robbery.  According to UCHENDU, there is a green button behind the steering wheel.  There is no record of UCHENDU activating the duress button.

16. UCHENDU provided me with the phone number of the DEVICE during the interview on February 15, 2022. On February 17, 2022, UCHENDU was contacted via the DEVICE by the FBI in order to set up the polygraph examination.

17. On February 18, 2022, UCHENDU submitted to a polygraph examination conducted by FBI Special Agent Michael Fitzgerald conducted the polygraph at the Federal Bureau of Investigation Lansing Resident Agency. SA Fitzgerald is a certified Federal Polygraph Examiner and has been for 11 years.  SA Fitzgerald has served as an FBI Special Agent for 18 years.  Prior to his service as an FBI special agent, SA Fitzgerald worked as a prosecuting attorney in Cuyahoga County, Ohio for approximately 2 ½ years.

18. During the pre-polygraph interview, UCHENDU told SA Fitzgerald that he called and texted individuals using his Apple iPhone (DEVICE) just prior to going to Best Buy. UCHENDU stated he communicated with his brother, his girlfriend, and an individual UCHENDU knows by the alias of Trap Baby Pack. UCHENDU stated he may have communicated with other individuals prior to going to Best Buy but he could not remember the names of the individuals. Video from the interior of the EL van show UCHENDU manipulating his phone prior to arriving at Best Buy. UCHENDU also stated he is aware of the duress button on the steering wheel.  UCHENDU is not certain what happens if he activates the duress button but he is trained that he is supposed to push it if he is being robbed.

19. UCHENDU submitted to a polygraph examination and SA Fitzgerald questioned him on his involvement, if any, in the planning of the robbery and receipt of the proceeds from the robbery. I am advised the results of the polygraph examination were deemed conclusive and deception was indicated. SA Fitzgerald informed UCHENDU that he failed the polygraph examination.

UCHENDU stated that he was being framed for the robbery and that he would like an attorney. Once UCHENDU asked for an attorney, Agents ceased any further questioning of UCHENDU.

20. Before the pre-polygraph interview and polygraph examination, UCHENDU's Apple iPhone (DEVICE) was place on the counter outside of the polygraph interview room. Agents requested permission to search the DEVICE and UCHENDU refused. agents informed UCHENDU that his phone would be seized to preserve evidence and that agents would seek a warrant to search the DEVICE. UCHENDU provided a passcode for the DEVICE and the DEVICE was place in airplane mode to prevent the destruction of evidence.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

21. The requested warrant would authorize extraction and copying of electronically stored information, under Rule 41(e)(2)(B), for the purpose of locating and seizing records and information.

22. *Forensic evidence*.  This application seeks permission to locate forensic electronic evidence that establishes how the DEVICE was used, the purpose of the use, who used it, and when, in order to determine the use of the DEVICE as a tool to facilitate the commission of the SUBJECT OFFENSES. This application also seeks other forensic electronic evidence of the crimes under investigation, including communications, photos, videos, contact information, and location information, along with evidence that will help identify DEVICE's primary user(s) and owner(s). I believe there is probable cause that such forensic electronic evidence may be on the DEVICE because, based on my training and experience, I understand that:

   a. records and information on electronic devices can provide evidence of a file that was once on the device but has since been deleted or edited, or of a deleted portion of a

file (such as a paragraph that has been deleted from a word processing file, or a portion of a recorded video);

b.  forensic evidence on a device can also indicate who has used or controlled the device, and this "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence;

c.  a person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when; and

d.  the process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how the device behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

23. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

24. *Manner of execution*. Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the

physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## REQUEST TO SEARCH THE DEVICES

25. Based on my experience, I know that individuals involved in committing the SUBJECT OFFENSES often communicate with others via cellular telephones to discuss, plan, and coordinate their activities. I also know that cellular telephones can store text messages, multimedia messages, contact information, call history, emails, photographs, videos, Internet Protocol (IP) addresses, geo-locational and mapping information, and internet searches and use.

26. Based on the foregoing, I submit there is probable cause to believe the DEVICE will contain evidence or instrumentalities of the SUBJECT OFFENSES. This information will likely provide evidentiary insight involvement in the SUBJECT OFFENSES.

## CONCLUSION

27. I respectfully submit that there is probable cause to believe that evidence, fruits, and instrumentalities of SUBJECT OFFENSES may be found in the DEVICE described in Attachment A.

28. I therefore respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.